SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-09-0339-PR |
| Appellee, | ) | |
| | ) | Court of Appeals |
| v. | ) | Division One |
| | ) | No. 1 CA-CR 08-0318 |
| JOSEPH WESLEY GOMEZ, | ) | |
| | ) | Maricopa County |
| Appellant. | ) | Superior Court |
| | ) | No. CR2006-166549-001 DT |
| | ) | |
| | ) | |
| | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Gary E. Donahoe, Judge

**AFFIRMED**

_____

Memorandum Decision of the Court of Appeals, Division One
Filed Oct. 29, 2009

**AFFIRMED IN PART, VACATED IN PART**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                        Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Criminal Appeals/Capital Litigation Section
          Julie A. Done, Assistant Attorney General
Attorneys for State of Arizona

BRUCE F. PETERSON, OFFICE OF THE LEGAL ADVOCATE               Phoenix
     By   Frances J. Gray, Deputy Legal Advocate
Attorneys for Joseph Wesley Gomez

_____

**H U R W I T Z**, Vice Chief Justice

¶1      The  issue  before  us  is  whether  the  Confrontation

Clause of the Sixth Amendment to the United States Constitution

is violated when a testifying expert offers an opinion on the similarity of DNA profiles prepared by technicians who did not testify. We conclude that the expert's testimony did not contravene the Confrontation Clause.

**I.**

¶2 In 2006, Joseph Wesley Gomez was arrested and charged with crimes related to a home invasion. Police collected items from the crime scene and submitted them, along with a blood sample taken from Gomez, to a laboratory. The laboratory analyzed DNA from the items and compared the results with the DNA from the blood sample.

¶3 In performing DNA testing and analysis, the laboratory used an "assembly line" method that involved seven steps. During the first six steps of the process, technicians isolate and amplify the DNA and generate profiles. The technicians do not interpret data or draw conclusions during these first six steps, in which machines are used for every step except the initial screening of submitted items for DNA.[1] Various

---

[1] The evidence is screened initially by a technician for the presence of DNA. If DNA is found, it is extracted from the evidence and a machine measures its quantity. Copies of specific regions of the DNA are then machine generated. Machines then separate the DNA so that the alleles may be examined and determine which alleles are present. A software program processes that data and generates DNA profiles, which list the number of alleles present at certain spots within the genetic code. Finally, an analyst examines the generated profiles and compares them to known profiles.

technicians involved in the laboratory processes did not testify at Gomez's trial.

**¶4**      The State instead called a single witness about the DNA testing. That witness, a senior forensic analyst and supervisor at the laboratory, testified in detail about the laboratory's operating procedures, standards, and safeguards. Although the analyst had not witnessed all of the steps in the process, she had checked the technicians' records for any deviations from the laboratory's protocols. The analyst had performed the initial evidence screening and DNA extraction on most of the items, and she testified about the chain of custody for all items. For each sample, the analyst personally performed the final step in the process, interpretation and comparison. This step required her to compare the DNA profiles generated in the laboratory, and it was the only step involving human analysis.

**¶5**      The analyst testified that several profiles derived from evidence at the crime scene "matched" the profile obtained from Gomez's blood sample.[2] The data from the testing process were not introduced into evidence as exhibits.

---

[2]      The analyst testified that the odds of finding a DNA match from someone other than Gomez for the DNA on each piece of evidence from the crime scene ranged from one in thirteen thousand to one in 1.2 sextillion.

¶6     Gomez was convicted of the charged felonies. The court of appeals affirmed, rejecting Gomez's argument that the expert's testimony violated the Confrontation Clause. *State v. Gomez*, 1 CA-CR 08-0318 (App. Oct. 29, 2009) (mem. decision).

¶7     We granted review because the application of the Confrontation Clause to expert testimony about DNA profiles is an issue of statewide importance likely to recur. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24 (2003).

## II.

¶8     The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The "primary object" of the Confrontation Clause is "testimonial hearsay." *Crawford v. Washington*, 541 U.S. 36, 53 (2004). *Crawford* declined to establish a precise definition of "testimonial," but gave examples such as affidavits, prior testimony, depositions, and items contained in "formalized" materials. *Id.* at 51-52.

¶9     In *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2532 (2009), the Supreme Court held that expert affidavits containing the results of forensic tests prepared for purposes of trial were testimonial hearsay. In *Melendez-Diaz*, analysts tested a substance, found it to be cocaine, and signed

4

affidavits so affirming. *Id.* at 2531. The Court found that the defendant's confrontation rights were violated when the State used the affidavits to prove that the tested substance was cocaine without presenting any of the analysts for cross-examination. *See id.* at 2532.

### III.

¶10     Gomez contends that because the laboratory technicians who generated the DNA profiles did not testify at his trial, the analyst's testimony violated the Confrontation Clause. In assessing Gomez's argument, it is useful to separate the analyst's testimony into two parts: (1) her testimony regarding the laboratory protocols and the generation of the DNA profiles and (2) her expert opinion that several of the profiles matched. *See Pendergrass v. State*, 913 N.E.2d 703 (Ind. 2009) (addressing Confrontation Clause issues when state presented two witnesses, a laboratory supervisor who testified to procedures used in generating profiles and a DNA analyst who compared profiles).

### A.

¶11     Gomez correctly does not argue that the analyst's testimony about her role in the testing process, the laboratory's procedures, and the qualifications of the technicians was hearsay. This testimony was based on the analyst's personal knowledge. Rather, Gomez argues that the

5

analyst's testimony about the DNA profiles was hearsay because she was not involved in generating those profiles.

¶12 It is not clear that the data in the machine-generated DNA profiles were hearsay statements. In *United States v. Washington*, a divided Fourth Circuit held that printed data from a gas chromatograph were not hearsay statements and therefore the Sixth Amendment was not offended when the data were introduced into evidence without offering the testimony of the technicians who operated the machine. 498 F.3d 225, 229-32 (4th Cir. 2007). *But see id*. at 232-35 (Michael, J., dissenting) (concluding that data printouts are testimonial hearsay). After *Melendez-Diaz*, the Supreme Court denied certiorari in *Washington*, 129 S. Ct. 2856 (2009), and the Court has not yet decided whether machine-generated data are testimonial hearsay. Some courts, however, have so held. *See, e.g.*, *Commonwealth v. Banville*, 931 N.E.2d 457, 466 (Mass. 2010) (involving DNA profiles); *see also Washington*, 498 F.3d at 233 (Michael, J., dissenting) (collecting cases to show that courts "consistently consider computer-generated assertions of fact as hearsay statements"). We assume without deciding that the machine-generated DNA profiles here are hearsay statements.

¶13 We also note that the profiles were not introduced into evidence as exhibits at Gomez's trial; the analyst simply testified about them. In *Banville*, the Massachusetts Supreme

Judicial Court held that the Confrontation Clause is not offended when an expert relies on testimonial hearsay to form an opinion so long as the expert does not testify to the details of the hearsay and the hearsay itself is not admitted. *See Banville*, 931 N.E.2d at 466-67. The expert in this case did not testify in detail about the DNA profiles and, as in *Banville*, the profiles were not admitted into evidence as exhibits. Nonetheless, without deciding the issue, we assume that the analyst's testimony here was functionally equivalent to the introduction of the profiles into evidence.

¶14    In considering Gomez's argument that the analyst's testimony about the profiles violated the Sixth Amendment, we start from the premise that the Confrontation Clause does not require that every person in the chain of custody be available for cross-examination. *Melendez-Diaz* expressly rejected the notion that "anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." 129 S. Ct. at 2532 n.1. Rather, the Court emphasized that "[i]t is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live." *Id.* The Sixth

Amendment requires only that those who do testify about the chain of custody be available for cross-examination. *Id.*

¶15    Gomez does not contend in this Court that the chain of custody of the DNA samples was insufficiently established. Police officers testified that the evidence was collected and sent to the laboratory, and the analyst testified that the evidence was received, processed, tested, and returned. The analyst testified from her own knowledge not only about the laboratory's general procedures, but also about the records kept by the laboratory in this case. The chain of custody testimony did not violate the Confrontation Clause simply because every technician who handled and processed the samples did not testify. *See Melendez-Diaz*, 129 S. Ct. at 2532 n.1.

¶16    The remaining question, then, is whether Gomez's inability to cross-examine the technicians deprived him of his confrontation rights with respect to the analyst's testimony about the profiles. If the DNA profiles are hearsay statements, they are in effect statements of the processing machine about the data contained in the samples. The profiles contain neither the opinion nor the statement of the technicians. The machine, of course, cannot be cross-examined. The issue thus is whether the Confrontation Clause was satisfied because the analyst, rather than the technicians, was available for cross-examination.

¶17      In virtually identical circumstances, several courts have held that the testimony of a witness with knowledge of how the profiles were prepared satisfies the Sixth Amendment. The Indiana Supreme Court's decision in *Pendergrass* is particularly instructive. In that case a laboratory supervisor testified regarding the processing of DNA evidence. 913 N.E.2d at 704. The supervisor had checked the work of the processors and testified about the laboratory's operating procedures. *Id.* at 707-08. Certificates containing data about the DNA profiles generated at the laboratory were introduced into evidence during the supervisor's testimony. *Id.* at 704. A separate witness then compared the profiles and drew conclusions as to whether the defendant was the father of a rape victim's aborted fetus. *Id*. at 705.

¶18      The defendant in *Pendergrass* contended that the certificates should not have been admitted into evidence without the testimony of the employees who processed the samples. The Indiana Supreme Court rejected that argument, pointing out that the primary purpose of cross-examination is to test the reliability of a statement. *See id.* at 708. In *Pendergrass*, as here, the supervisor "would be a competent witness, perhaps the ideal witness, against whom to lodge such challenges," because she "had personal knowledge of the laboratory's work on the specimens at issue as the person who performed the technical

9

review." *Id.* The Indiana court distinguished *Melendez-Diaz*, noting that the defendant in *Melendez-Diaz* had no opportunity to cross-examine anyone "involved in the substantive analysis." *Id.*

¶19    *United States v. Boyd*, 686 F. Supp. 2d 382 (S.D.N.Y. 2010), reached the same conclusion on facts indistinguishable from those before us. In *Boyd*, as here, a laboratory supervisor testified to the laboratory processes and results. *Id.* at 385. The supervisor had compared the DNA profiles generated by the laboratory but had not witnessed some of the preceding steps, which were performed by technicians. *Id.* at 384-85. The court found no Confrontation Clause violation, noting that the testimony showed that the laboratory had established procedures, there was "little to no discretion" in executing the other steps of the testing process, and the technicians would have been "less able to respond to questions about the intervening procedures than the more expert witness who was actually called to the stand." *Id.* at 385. The court observed that

> [o]nly the final stage of the DNA testing involved the type of analytical judgment for which a certificate would be an inadequate substitute for in-court testimony under the Sixth Amendment. But this was precisely where the Government provided live testimony in the form of the expert who performed this step.

*Id.*

¶20     Consistent with *Pendergrass* and *Boyd*, other jurisdictions have held that DNA profiles may be admitted at trial when the laboratory technicians who handled the samples and obtained the machine-generated data do not testify, as long as someone familiar with the profiles and laboratory procedures is subject to cross-examination.  *See, e.g.*, *Vann v. State*, 229 P.3d 197 (Alaska Ct. App. 2010); *Aguilar v. Commonwealth*, 699 S.E.2d 215 (Va. 2010); *see also State v. Dilboy*, 999 A.2d 1092 (N.H. 2010) (involving an expert testifying about a toxicology report he had not prepared personally); *State v. Bullcoming*, 226 P.3d 1, 9 (N.M. 2010), *cert. granted*, 131 S. Ct. 62 (U.S. Sep. 28, 2010) (finding Confrontation Clause satisfied when gas chromatograph evidence was admitted without testimony of analyst who prepared report, because another qualified analyst was subject to cross-examination at trial; characterizing original analyst as a "mere scrivener;" concluding that "the live, in-court testimony of a separate qualified analyst is sufficient to fulfill a defendant's right to confrontation").  Here, as in these cases, the processing technicians performed no analysis, and the testifying analyst had extensive knowledge of the laboratory's procedures, had reviewed the technicians' work, and was familiar with the machine-generated data.

¶21     We find the reasoning in these cases compelling.  The technicians at most could have testified about the mechanical

11

steps they took to process the DNA samples. The analyst was able to review that work, testify from her own knowledge as to the procedures used, and answer questions during cross-examination about the accuracy of the end results. The analyst's testimony therefore did not offend the Confrontation Clause.

**B.**

¶22      Regarding the analyst's expert opinion, we repeatedly have held that the Confrontation Clause is not violated when an expert bases testimony on data provided by others who are not subject to cross-examination. We have held that a medical examiner may offer an expert opinion based on review of reports and test results prepared by others, as long as the testifying expert does not simply "act as a conduit for another non-testifying expert's opinion." *State v. Snelling*, 225 Ariz. 182, 187 ¶ 19, 236 P.3d 409, 414 (2010) (internal quotation marks omitted) (quoting *State v. Smith*, 215 Ariz. 221, 228 ¶ 23, 159 P.3d 531, 538 (2007)). In *Snelling*, the testifying medical examiner reviewed photographs of the victim and an autopsy report prepared by another pathologist and offered opinions as to cause of death based on the test results in that report. *Id.* at ¶ 20. We confirmed that the defendant's confrontation right extended only to the testifying witness, not to those whose findings formed the basis for the witness's opinion. *Id.; see*

12

*also Smith*, 215 Ariz. at 228-29 ¶¶ 21-26, 159 P.3d at 538-39 (finding no Confrontation Clause violation when an expert, in forming independent conclusions, reasonably relies on information obtained from others not testifying at trial); *cf.* Ariz. R. Evid. 703 (allowing expert testimony to be based on facts or data otherwise not admissible, "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject").

¶23 As in *Snelling*, the analyst here did not act as a "conduit" for the opinions of others. *See Snelling*, 225 Ariz. at 187 ¶¶ 19, 20, 236 P.3d at 414. Rather, she formed her own opinions, based on a type of data normally relied upon by experts in her field. *See id.* at ¶ 20; *Smith*, 215 Ariz. at 228 ¶ 24, 159 P.3d at 538. We found no Confrontation Clause violation in *Snelling*, even though the testifying medical examiner "referred to the [autopsy] report's findings," 225 Ariz. at 187 ¶ 20, 236 P.3d at 414, because the examiner reached her own conclusions and was subject to cross-examination as to those conclusions, *id.; see also United States v. Turner*, 591 F.3d 928, 930 (7th Cir. 2010) (supervisor allowed to testify to independent conclusions as an expert witness on the basis of a report generated by forensic analyst); *United States v. Richardson*, 537 F.3d 951, 960 (8th Cir. 2008) (analyst allowed to testify to independent conclusions as an expert witness on

13

basis of her review of results of testing conducted by another analyst); *Vann*, 229 P.3d at 210 (same).

¶24     The testifying expert in this case was subject to cross-examination about her independent conclusion that several of the DNA profiles came from the same person.  The analyst's reliance on data obtained from non-testifying witnesses in arriving at her opinion did not violate the Confrontation Clause.

## IV.

¶25     Gomez requested a jury instruction that "[t]he work of non-testifying witnesses is admitted only to allow the consideration of the reasons for the expert's opinion."  He argued that the instruction was compelled by Arizona Rule of Evidence 105, which provides that "[w]hen evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."  The trial court rejected the proposed instruction as a comment on the evidence.  The court of appeals upheld the denial of the instruction on different grounds, finding the instruction legally flawed.  *Gomez*, 1 CA-CR 08-0318 at ¶ 27.

¶26     The court of appeals correctly noted that a trial court generally does not have to separate the good from the bad in a proposed instruction.  *See State v. Mitchell*, 204 Ariz.

14

216, 220 ¶ 22, 62 P.3d 616, 620 (App. 2003). Rule 105, however, mandates a limiting instruction on request. The submission of an inadequate instruction does not waive the defendant's right to a limiting instruction in a case covered by Rule 105. *Readenour v. Marion Power Shovel*, 149 Ariz. 442, 451, 719 P.2d 1058, 1067 (1986) (holding that rejection of an inadequate instruction "should not be used as a reason for giving no instruction at all" (internal quotation mark omitted) (quoting 1 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 105[05] at 105-37 (1985))).

¶27      We nonetheless find no reversible error. Rule 105 applies only when the evidence "is admissible . . . for one purpose but not admissible . . . for another purpose." Because the DNA profiles were not themselves admitted into evidence, the instruction Gomez requested necessarily related to the analyst's testimony about the profiles. In contrast to *Snelling*, where testimony about the underlying data was offered only to support an expert opinion, the analyst's testimony here about the DNA profiles was not so limited. The analyst testified as an expert on DNA, but also established the chain of custody, testified how the evidence submitted by the police to the laboratory was processed, and explained how DNA profiles were derived from that evidence. Her testimony thus was offered to demonstrate that the profiles were in fact generated from DNA obtained at the

15

crime scene and from Gomez.  Because the analyst's testimony about the profiles was not submitted simply to support her expert opinion, a limiting instruction was not required.

**IV.**

¶28    For the reasons above, we affirm Gomez's convictions and sentences, but vacate ¶¶ 21-27 of the memorandum decision of the court of appeals.

_____
                    Andrew D. Hurwitz, Vice Chief Justice

CONCURRING:

_____
Rebecca White Berch, Chief Justice

_____
W. Scott Bales, Justice

_____
A. John Pelander, Justice

_____
J. William Brammer, Jr., Judge[*]

---

[*]    Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable J. William Brammer, Jr., Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.